*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF VIRGINIA KERMATH, by
COSETTE ROWLAND, Personal Representative,

UNPUBLISHED
January 14, 2020

Plaintiff-Appellant,

v

No. 345650
Oakland Circuit Court
LC No. 2016-156377-NO

INDEPENDENCE VILLAGE OF OXFORD,
LLC, UNIFIED MANAGEMENT SERVICES,
and SENIOR VILLAGE MANAGEMENT,

Defendants-Appellees.

Before: RIORDAN, P.J., and SAWYER and JANSEN, JJ.

PER CURIAM.

Plaintiff, Estate of Virginia Kermath, by Cosette Rowland, personal representative, appeals as of right the trial court's opinion and order granting summary disposition to defendants, Independence Village of Oxford, LLC (Independence Village), Unified Management Services (Unified Management), and Senior Village Management (Senior Management) (collectively, defendants). We affirm.

## I. FACTUAL BACKGROUND

This matter arises from the death of Virginia, who was 89 years old at the time of her passing. In 2009, Virginia was diagnosed with dementia. In 2010, Virginia moved into Independence Village in Oxford, Michigan. Independence Village is a nonlicensed independent-living facility with an "enhanced[-]living" section that offers additional amenities.[1] The median

---

[1] Independence Village's status as an unlicensed senior-living facility is important because a senior-living facility is distinct from a nursing home. A nursing home is defined as "a nursing care facility, including a county medical care facility, that provides organized nursing care and medical treatment to [seven] or more unrelated individuals suffering or recovering from illness,

age of a resident at Independence Village varies between 70 and 90 years old. Independence Village is separated into two sections: Independent and Harbors. Harbors and Independent are located on separate sides of the same building, which together, make up Independence Village. Harbors, the enhanced-living and higher level of care section of Independence Village, makes up 37 out of Independence Village's 145 apartments. Harbors has a registered nurse, a group of caregivers that care for residents, and certain services not offered to residents in Independent. Residents of Independent are entitled to a continental breakfast and dinner, biweekly housekeeping, and laundry for linens. If a resident of Independent wanted additional services, he or she could opt for them at an additional cost through an independent third-party contractor.

The front-door entrance to Independence Village locked at 8:00 p.m. and unlocked at 7:00 a.m. The only security cameras in Independence Village were located near the front-door entrance. Receptionists remained at the front-door entrance until 11:00 p.m. After 11:00 p.m., there was no way to ensure that a resident did not leave the building. Independence Village did not have any sort of alarm system that would have notified the front desk that a side-exterior door had been opened nor did it have any security cameras around the building.

On June 12, 2010, Virginia signed the lease for her first-floor apartment at Independence Village in the Independent section. Virginia's lease did not specify any additional services because additional services were provided at additional cost through Senior Home Care Solutions, a company that leases an office inside Independence Village and provides residents with "independent subcontracted care." To get inside Virginia's apartment, she needed one key to enter the building and a separate key to enter the unit. While Virginia's apartment door did not automatically lock when shut, the exterior doors to the building did. On July 26, 2010, Rowland entered into an agreement with Senior Home Care Solutions on Virginia's behalf so that Virginia could receive additional services. For $250 a month, a Senior Home Care Solutions employee went to Virginia's apartment twice a day to help with medications and meals, and to notify Virginia about community activities. Eventually, Rowland terminated the agreement with Senior Home Care Solutions after Virginia was given the incorrect medication. Rowland was put in contact with Octavia Jones, an independent third-party caregiver. Jones worked with Virginia seven days a week, helping Virginia to dress, shower, take her medication, and eat meals.

Virginia's physical and mental condition deteriorated while living at Independence Village. After a number of falls and conversations with Jones, Virginia and her family decided that Virginia should move into Rowland's home. Arrangements were made so that Virginia would move in with Rowland sometime in February 2014. On December 14, 2013, Jones helped Virginia into bed before leaving for the night. When Jones returned to Independence Village the

---

injury, or infirmity." MCL 333.20109(1). The Michigan Department of Consumer and Industry Services, Bureau of Health Systems, Division of Health Facility Standards and Licensing has promulgated a myriad of administrative rules that address nursing homes and nursing care facility standards. Because Independence Village is a nonlicensed facility, the regulations that govern nursing homes are inapplicable.

following morning, around 8:00 a.m., Virginia was standing outside of Independence Village, wearing only a nightgown. Virginia had left her apartment without her keys and exited Independence Village through a side-exterior door that automatically locks. Virginia was outside for approximately 14 minutes. It was five degrees outside at the time. Virginia suffered from hypothermia and frostbite that contributed to her death a few weeks later.

## II. PROCEDURAL HISTORY

Plaintiff filed a complaint against defendants, alleging that defendants owed Virginia a duty to exercise due care and caution and breached that duty of care by "negligently and recklessly failing to monitor and/or protect doorways and exits at all times so as to prevent an elderly, confused resident from being locked out of the building." Plaintiff further alleged that defendants breached their duty of care by failing to provide functional alarms on all of the doors to alert staff that a resident exited the facility and failing to provide residents with a reliable means of notifying staff that they are locked out of the facility.

Defendants filed a motion for summary disposition under MCR 2.116(C)(8) and (10), arguing that summary disposition was appropriate because plaintiff cannot establish that they had a duty to monitor all of the exits and entrances. The trial court granted defendants' motion for summary disposition under MCR 2.116(C)(8) and (10), holding that defendants did not owe Virginia a common-law duty of care because Virginia's harm was not foreseeable. Plaintiff now appeals the trial court's order.

## III. ANALYSIS

Plaintiff argues that the trial court erred when it granted defendants' motion for summary disposition because defendants owed Virginia a common-law duty of care. We disagree.

"This Court reviews a trial court's decision on a motion for summary disposition de novo. *Johnson v Vanderkooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). The trial court granted defendants' motion for summary disposition under MCR 2.116(C)(8) and (10). This Court must treat defendants' motion as having been decided under MCR 2.116(C)(10) to the extent the trial court considered evidence beyond the pleadings. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 544; 904 NW2d 192 (2017).

"[A] motion under MCR 2.116(C)(10) tests the *factual sufficiency* of a claim." *El-Khalil v Oakwood Healthcare, Inc*, __ Mich __, __; __ NW2d __ (2019) (Docket No. 157846); slip op at 6. When considering a motion brought under MCR 2.116(C)(10), the trial court must review the evidence in a light most favorable to the nonmoving party. *Id*. Summary disposition is only appropriate when there is no genuine issue of material fact. *Id*., citing *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). " 'A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ.' " *El-Khalil*, __ Mich at __; slip op at 7, quoting *Johnson*, 502 Mich at 761.

"Whether a defendant owes any duty to a plaintiff to avoid negligent conduct is a question of law for the court to resolve." *Dyer v Trachtman*, 470 Mich 45, 49; 679 NW2d 311 (2004). To establish a prima facie case of negligence, a plaintiff must prove the following: "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the

plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). In a negligence action, the primary focus is on the existence of a duty, which is the primary "threshold question." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). Although there is no general duty to aid or protect another, "[e]very person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the persons or property of others." *Id*. "Generally, the duty that arises when a person actively engages in certain conduct may arise from a statute, a contractual relationship, or by operation of the common law." *Id*. In this case, plaintiff alleges that defendants' duty of care arose from the common law.

The Michigan Supreme Court has stated the following with respect to a common-law duty of care:

> At common law, the determination of whether a legal duty exists is a question of whether the relationship between the actor and the plaintiff gives rise to any legal obligation on the actor's part to act for the benefit of the subsequently injured person. The ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty. Factors relevant to the determination whether a legal duty exists include the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented. We have recognized, however, that the most important factor to be considered in this analysis is the relationship of the parties and also that there can be no duty imposed when the harm is not foreseeable. In other words, before a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable. If either of these two factors is lacking, then it is unnecessary to consider any of the remaining factors. [*Id*. at 661 (citations and quotation marks omitted).]

"Frequently, the first component examined by the court is the foreseeability of the risk." *Buczkowski v McKay*, 441 Mich 96, 101; 490 NW2d 330 (1992).

## A. FORESEEABILITY

Plaintiff argues that there is a genuine issue of material fact as to whether Virginia's injury was foreseeable. Considering the facts in the light most favorable to plaintiff, defendants did not, under the circumstances of this case, have a duty to prevent the injuries suffered by Virginia because Virginia's injury was not foreseeable.

Whether an injury is foreseeable "depends upon whether a reasonable person 'could anticipate that a given event might occur under certain conditions.' " *Composto v Albrecht*, __ Mich App __, __; __ NW2d __ (2019) (Docket No. 340485); slip op at 4 (citations and quotation marks omitted). Foreseeability is a question of fact, requiring an objective test that focuses on "what risks the reasonable participant, under the circumstances, would have foreseen." *Id*. The proper inquiry is "whether it was foreseeable that a defendant's conduct may create a risk of harm to another person and whether the result of that conduct . . . was foreseeable." *Johnson v*

-4-

*A&M Custom Built Homes of West Bloomfield, LPC*, 261 Mich App 719, 725; 683 NW2d 229 (2004). The factual circumstances of the case—i.e., the parties' relationship to each other—define the risk. *Bertin v Mann*, 502 Mich 603, 620; 918 NW2d 707 (2018).

When Virginia walked outside in the morning hours on December 15, 2013, she did so wearing only her nightgown. Because Virginia walked outside without her keys and the side-exterior doors lock automatically, Virginia was unable to get back inside Independence Village. After being outside for approximately 14 minutes, Virginia suffered from hypothermia and frostbite—injuries that contributed to her death. Thus, the question is whether there is a genuine issue of material fact as to whether it was reasonably foreseeable that a resident living in the Independent section of Independence Village would suffer from life-threatening injuries because he or she is unable to reenter Independence Village after walking outside a side-exterior door in the early morning hours in December. The focus is on what risks a reasonable person, under the circumstances, would have foreseen. *Id*.

Plaintiff argues that Virginia's injuries were reasonably foreseeable because defendants operate a residential facility for seniors, who are at a higher risk of elopement and diminished mental capabilities. Plaintiff asserts that it was impossible for defendants to not know that their residents required additional care and supervision. Independence Village is an independent senior-living facility; it is not an assisted-living facility. As a resident of the Independent section of Independence Village, Virginia was entitled to a continental breakfast and dinner, biweekly housekeeping, and laundry for linens. Because residents of Independent were presumed to be capable of living independently, there was no need to monitor all of the side-exterior exits to the building.

Plaintiff claims that defendants were aware or should have been aware that Virginia suffered a diminished mental state and was likely to wander outside in the manner that she did. An employee of Independence Village put Rowland in contact with Senior Home Care Services because Virginia required additional services, specifically, assistance with her medication. After Virginia's contract with Senior Home Care Solutions was terminated, an Independence Village employee put Rowland in contact with Jones for additional assistance. The fact that an Independence Village employee connected Virginia with independent caregivers shows that defendants were at least aware that Virginia was in a more fragile state. The third-party caregivers also helped Virginia take her dementia medication. Additionally, Virginia was asked to eat her meals in the Harbors dining area because she was exhibiting disruptive behavior, but eventually ate all of her meals in her apartment. There were also a few incidents when Jones was called to escort Virginia back to her apartment because Virginia had wandered into the lobby wearing only her nightgown. However, there is no evidence that shows that defendants were specifically aware of Virginia's dementia or declining mental health.

Moreover, defendants had no notice that Virginia might wander outside the building. When Virginia first moved into Independence Village, she moved into Independent rather than Harbors because she did not require the intensive care that most of the individuals in Harbors needed. Plaintiff provides no evidence that Virginia or anyone in Virginia's family informed an Independence Village employee that Virginia's mental state had deteriorated or to what level it deteriorated since she moved in. Jones testified that she reports to the family of her clients and does not discuss her clients with anyone at Independence Village. The evidence shows that

defendants were not involved in the personal care of the residents and unlikely to know that a resident's mental state placed them at risk of elopement. Even though Virginia's health had deteriorated, her family found it unforeseeable that Virginia would wander outside in only her nightgown on a December morning. Rowland and Christian Carter Kermath, Virginia's son, both testified that they never expected Virginia to wander outside like she did. Although the circumstances of this case are unfortunate, the trial court did not err in concluding that Virginia's harm was not foreseeable, and thus no genuine issue of material fact remained on the issue of foreseeability.

## B. SPECIAL RELATIONSHIP

Plaintiff next argues that defendants had a duty to exercise due care and caution by monitoring its residents and ensuring that its residents do not exit Independence Village without a way to reenter. Plaintiff alleges "negligence through nonfeasance, which is passive inaction or the failure to actively protect others from harm." *Chelik v Capitol Transp, LLC*, 313 Mich App 83, 91; 880 NW2d 350 (2015). While there is no general duty to aid or protect another, a special relationship giving rise to a duty exists when one person entrusts herself " 'to the control and protection of another, with a consequent loss of control to protect himself.' " *Hill*, 492 Mich at 666, quoting *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499; 418 NW2d 381 (1988).

Plaintiff argues that a special relationship existed between defendants and Virginia because Virginia entrusted herself to defendants' control and protection by moving into Independence Village.[2] Plaintiff's argument fails because Virginia never relinquished control over her own safety to defendants. Independence Village is not a nursing home; it is a residential facility for seniors who wish to live independently, but with some assistance. Virginia was entitled to a limited number of services as a resident of the Independent. Independence Village did not offer any other services to Independent residents. Plaintiff presents no evidence that there was any other understanding with respect to the services and care that Independence Village provided. Both Virginia and Rowland understood that, if Virginia required additional care, a third-party contractor would have to provide it. In fact, that is what Virginia did. Virginia contracted with Senior Home Care Solutions to provide assistance with medication and then with Jones to provide Virginia with medication assistance, bathing, dressing, and notifications of community activities. Thus, at no point did Virginia relinquish control to defendants.

Plaintiff claims that there is a genuine issue of material fact as to whether Virginia could freely leave Independence Village. Indeed, a receptionist at Independence Village conducted daily wellness checks for all Independent residents to ensure that everyone was accounted for.

---

[2] A special relationship generally exists between a landlord and its tenants, and thus, a landlord owes a duty "to maintain the physical premises over which they exercise control." *Bailey v Schaaf*, 494 Mich 595, 604; 835 NW2d 413 (2013), citing *Williams*, 429 Mich at 499-500. Plaintiff does not claim that Virginia's special relationship with defendants arose from a landlord-tenant relationship.

Beyond the wellness checks, plaintiff presents no other evidence demonstrating that defendants restricted Virginia's ability to come and go from Independence Village. According to Jones, a number of residents in Independent still drive and regularly leave Independence. There is no evidence that residents were prohibited from leaving Independence Village or were required to obtain permission before leaving. Both Rowland and Christian testified that Virginia could come and go from Independence Village as she pleased. Virginia left Independence Village nearly every Sunday to visit Rowland's home. The evidence shows that it was Virginia's family, not defendants, who sought to prevent Virginia from leaving Independence Village in light of Virginia's physical and mental condition. And although there is evidence that Virginia occasionally required an escort back to her room because she wandered into a particular area of Independence Village, such evidence does not show that Virginia was ever physically prevented from leaving Independence Village.

Plaintiff provides no evidence demonstrating that Virginia entrusted herself to defendants control and protection, or that Virginia relinquished any control to protect herself. Accordingly, there is no genuine issue of material fact as to whether a special relationship between defendants and Virginia existed. Even if a special relationship between defendants and Virginia existed, defendants did not have a duty to protect Virginia from an unforeseeable risk. Thus, even if this Court were to decide that Independence Village had a special relationship with their residents, there still would be no duty because it was not foreseeable that Virginia would wander outside at night in December, wearing just her nightgown and without her keys. Because there is no genuine issue of material fact regarding the foreseeability of Virginia's harm or the existence of a special relationship, "it is unnecessary to consider any of the remaining factors." *Hill*, 492 Mich at 661 (citations and quotation marks omitted). Defendants did not owe Virginia a common-law duty of care to monitor all of the side-exterior exits. Summary disposition in favor of defendants was appropriate.

Affirmed.

/s/ Michael J. Riordan
/s/ David H. Sawyer
/s/ Kathleen Jansen